UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

INDEPENDENT LIVING CENTER OF      No. 2:06-cv-0435-MCE-KJM
SOUTHERN CALIFORNIA, INC., a
nonprofit California
corporation; MARGARET DOWLING,
NATHAN THORNTON, SYLVIA HEDBIG,
LINDA BLOCK, HECTOR REYES,
MICHAEL FERONA, HOMA KARIMZAD,
and BLANE BECKWORTH,

       Plaintiffs,

   v.                    MEMORANDUM AND ORDER

MICHAEL LEAVITT, Secretary of
U.S. Department of Health and
Human Services; SANDRA SHEWRY,
Director of California
Department of Health Services;
and STEVE WESTLY, Controller
of the State of California,

       Defendants.

----oo0oo----

///

///

///

///

///

1

1   Through the present motion, Plaintiffs seek to enjoin
2   implementation of the Medicare Prescription Drug, Modernization
3   and Improvement Act of 2003, 42 U.S.C. § 1395w-101, et seq.
4   ("MMA") to the extent that changes in prescription drug coverage
5   available to individuals who are both eligible for benefits under
6   Medicare and Medicaid (so-called "dual eligibles") are
7   unconstitutional.  Plaintiffs[1] argue they will suffer irreparable
8   harm unless this Court issues a mandatory injunction preventing
9   implementation of the MMA, which became effective on January 1,
10  2006.  They seek an order requiring the State's Medicaid program
11  to continue to provide prescription drug coverage to dual
12  eligibles as if the MMA had never been enacted.  Finally,
13  Plaintiffs argue that the copayment provisions for drugs
14  dispensed to dual eligibles under the MMA must also be enjoined.

15  For the reasons outlined below, Plaintiffs' Motion for
16  Preliminary Injunction is denied.

17  ///
18  ///
19  ///
20  ///
21  ///

22

23  [1]Plaintiffs include the Independent Living Center of
    Southern California, Inc. ("ILC"), an independent living center
24  established under the auspices of California Welfare and
    Institutions Code § 19801 to provide services to disabled
25  persons, as well as eight individuals who qualify as dual
    eligibles and who claim to have been impacted by implementation
26  of the MMA.  While Defendants argue that these Plaintiffs lack
    standing to bring the present action, the Court is not persuaded
27  on the basis of the record before it that standing is entirely
    absent.  Accordingly it will proceed to deciding this matter on
28  the merits.

## STATUTORY FRAMEWORK

Title XVIII of the Social Security Act, commonly known as the Medicare Act, establishes a program of federally subsidized health insurance for the elderly and disabled.  42 U.S.C. §§ 1395, et seq.  Coverage available under Medicare includes hospital inpatient and related care (Part A), supplemental coverage for outpatient services (Part B), and a managed-care alternative to Part B (known as Part C).  Through enactment of the MMA, Congress provided Medicare coverage for drugs under what is now referred to as Part D of the Medicare program.  As indicated above, Part D became effective on January 1, 2006.

Another portion of the Social Security Act, Title XIX, establishes a separate federal-state program providing medical assistance for categorically low-income persons.  42 U.S.C. §§ 1396, et seq.  This coverage, known as Medicaid, or MediCal in California, is administered by the states and funded in part through federal aid so long as each state's program complies with applicable Medicaid laws and regulations.  See Alexander v. Choate, 469 U.S. 287, 289 n.1 (1985).

About 6 million dual eligibles qualify for both Medicare and Medicaid benefits.  For those individuals, Medicare generally pays first and Medicaid provides protection for services not covered under Medicare.  Prior to enactment of the MMA, Medicaid paid for dual eligibles' prescription drugs.

///

///

///

1  In addition to receiving a fifty percent contribution from the

2  federal government for benefits provided under Medicaid,

3  including prescription drugs, the Medicaid Act also required

4  pharmaceutical companies to make substantial rebate payments in

5  return for dispensing their products under Medicaid.

6      Exclusive provision of prescription drugs through Medicaid

7  has changed with the advent of the MMA.  Under Part D, Medicare

8  becomes the primary payer for dual eligibles as to all drugs

9  covered under Medicare.  The Medicaid Act was consequently

10 amended to provide that Medicaid is not available for such drugs.

11 42 U.S.C. § 1396u-5(d)(1).  The State of California similarly

12 enacted Welfare and Institutions Code § 14133.23, which

13 eliminated the provision of drug benefits under MediCal to dual-

14 eligible beneficiaries that would otherwise now be covered under

15 Medicare, Part D.

16      The Enrollment Clause of the MMA requires that all dual

17 eligibles be automatically enrolled into private-entity

18 prescription drug plans on a random basis, with MediCal drug

19 coverage to cease on enrollment.  42 U.S.C. § 1395w-101(b)(1)(C).

20 The formularies for such plans are to be approved by the

21 Secretary of the U.S. Department of Health and Human Services

22 ("Secretary").  42 U.S.C. § 1395w-111(e)(1).  Each drug plan must

23 include drugs within each therapeutic category and class of

24 covered Part D drugs, although not necessarily all drugs with

25 such categories or classes.  42 U.S.C. § 1395w-104(b)(3)(C)(i).

26 If a particular drug is not covered under the assigned formulary

27 and a prescription is accordingly denied, a dissatisfied enrollee

28 can request review by an independent, outside entity.

4

1   42 U.S.C. § 1395w-22(g)(4).

2       In essence, the MMA shifts the cost of providing
3   prescription drugs to dual eligibles from Medicaid at Title XIX
4   to Medicare at Title XVIII.  In exchange for assuming this
5   obligation, under the so-called "clawback" provision of the MMA,
6   the states must reimburse the federal government for fifty
7   percent of the cost of providing dual eligibles prescription
8   drugs, which mirrors the fact that prior to the enactment of the
9   MMA the states were required to provide such drugs, with a fifty
10  percent contribution from the federal government.  42 U.S.C. §§
11  1396u-5(c)(1)-(2).  Under the MMA, unlike Medicaid,
12  pharmaceutical companies no longer are required to make rebate
13  payments.  In addition, under Part D, even dual eligibles with
14  incomes not exceeding the poverty level must make a modest co-
15  payment for needed drugs, ranging from $1 for generic medicines
16  to $3 for name brands.[2]

17      Because certain drugs that had been covered under MediCal
18  are not included under Medicare Part D, states may continue to
19  provide Medicaid coverage for such drugs, and California has so
20  elected.  The federal government has approved this extension.
21  (Decl. of Teresa Miller, ¶ 9)

22  ///

23  ///

24  ///

25

26      [2]This is a change from prior coverage available to dual
    eligibles under Medicaid, which provided that no services would
27  be denied on account of a beneficiary's "inability to pay a
    deduction, cost sharing, or similar charge..."  42 U.S.C. §
28  1396o(e).

1    In order to ease transition difficulties between drug

2  payment under MediCare and reassignment of dual eligibles to

3  coverage under Medicare Part D, the California Legislature

4  enacted legislation on an emergency basis to pay for Part D

5  drugs.  California Welfare and Institutions Code § 14133.23(f).

6  That emergency legislation was subsequently extended until May

7  16, 2006.

8    On February 16, 2006, the federal government notified the

9  State of California that it would provide reimbursement for

10  payments made under the emergency program enumerated above.  Id.

11  at ¶ 7.

12    In addition to California's provision of drugs on an

13  emergency basis under Medicaid, Part D also incorporates a "first

14  fill" policy designed to ensure that during the first three

15  months of Part D coverage, all drug plans must pay on a one-time

16  basis for any medications unavailable under the assigned Medicare

17  formulary but previously available under Medicaid.  (Culotta

18  Decl., ¶ 17).

19

20                        **FACTUAL BACKGROUND**

21

22    Plaintiffs contend that transfer of dual eligibles'

23  prescription drug coverage to Medicare has created a "dire

24  situation" rife with the potential for irreparable harm given

25  potential damage to dual eligibles' health if needed medications

26  cannot be obtained.  Plaintiffs contend that formularies assigned

27  by Medicare are less comprehensive than the drug benefits

28  formerly available under MediCal.

Although they concede that dual eligibles can apply for a
waiver/exception if drugs not on the formulary are determined to
be necessary, Plaintiffs contend that because the pharmacy cannot
represent the dual eligible in obtaining such a waiver/exception,
the process is too cumbersome inasmuch as treating physicians
simply will not take the time necessary to make such an appeal.
Plaintiff contends that this creates an "extraordinary barrier"
for dual eligibles to obtain necessary medicine.

Plaintiffs further contend that many dual eligibles have not
in fact been automatically enrolled into a drug formulary under
Medicare, which also poses a significant obstacle in obtaining
needed drugs.  Plaintiffs have provided declarations from two
pharmacists indicating that as many as 20-25 percent of dual
eligibles were not auto enrolled during the two weeks following
January 13, 2006 (See Declarations of Boo Nam Shin, R.Ph, and
Armen Tatevossian, R.Ph, ¶ 14), but have provided little evidence
that any widespread problem in this regard has persisted
throughout the transition period.

Finally, Plaintiffs argue that the co-payment requirement
imposed by Part D (whether $1 or $3) is impermissible because
many dual eligibles simply cannot afford any co-payment.

According to Plaintiffs, the State emergency legislation
which provides for payments to be made under MediCal pending the
transition to Medicare is simply a "band-aid" measure that does
not provide any lasting solution.

Defendants respond to these concerns by pointing out that
any transition of the scope contemplated by the MMA will
necessarily include certain "glitches."

1  They argue that the emergency provisions provided under both

2  state and federal law, as enumerated above, are designed to

3  minimize any disruption to dual eligible beneficiaries.  They

4  further contend that requiring minimal co-payments, for purposes

5  of fostering patient involvement in the system, is not

6  constitutionally impermissible.  Finally, they point out that

7  Medicare's reimbursement arrangements are overwhelmingly

8  automated, and that ordering any change at this point in the

9  transition process would cause substantial systems revisions and

10 result in vast confusion -- an outcome antithetical to the access

11 issues Plaintiffs presumably seek to address through their

12 lawsuit.  (See Culotta Decl., ¶ 19).  Defendants state that

13 Plaintiffs themselves have not suggested any mechanism superior

14 to what has already been implemented, other than to advocate a

15 wholesale return to the previous status quo.  See id.

16

17                           **STANDARD**

18

19     A preliminary injunction is an extraordinary remedy, and the

20 moving party has the burden of proving the propriety of such a

21 remedy by clear and convincing evidence.  *See* Granny Goose Foods,

22 Inc. v. Teamsters, 415 U.S. 423, 442 (1974).  In order to warrant

23 issuance of a preliminary injunction, under the so-called

24 "traditional" criteria the moving party must show (1) a strong

25 likelihood of success on the merits; 2) the possibility of

26 irreparable harm if relief is not granted; 3) that the balance of

27 hardship weights in its favor; and 4) an advancement of the

28 public interest in certain cases.

                              8

1  Johnson v. State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir.

2  1995).  Alternatively, a party seeking injunctive relief may also

3  demonstrate either: 1) a combination of probable success on the

4  merits and the possibility of irreparable injury; or 2) that

5  serious questions are raised and the balance of hardships tips

6  sharply in favor of granting the requested injunction.  See LGS

7  Architects, Inc. v. Concordia Homes of Nevada, 434 F.3d 1150,

8  1155 (9th Cir. 2006); Stuhlbarg Int'l Sales Co., Inc. v. John D.

9  Brush & Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001).  Both

10 analytical frameworks "represent 'extremes of a single

11 continuum,' rather than two separate tests."  Clear Channel

12 Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810 (9th Cir.

13 2003).  Under either formulation, however, the moving party must

14 show that it is likely to prevail on the merits.  Ashcroft v. Am.

15 Civil Liberties Union, 542 U.S. 656, 666 (2004).  While certainty

16 in this regard is not required, at an irreducible minimum at

17 least a "fair chance of success on the merits" has to be

18 demonstrated.  Johnson v. State Bd. Of Accountancy, 72 F.3d at

19 1429.

20    A preliminary injunction, in general, is considered an

21 extraordinary remedy that should not be granted unless the moving

22 party clearly establishes its entitlement to relief.  Mazurek v.

23 Armstrong, 520 U.S. 968, 972 (1997).  Here, Plaintiffs seek a

24 mandatory injunction because they ask for judicial intervention

25 to actually change the status quo by returning to an earlier

26 state of affairs (the pre-MMA framework) rather than simply

27 asking that the status quo be maintained pending resolution of

28 the case.

1   Courts should be extremely cautious about granting such a

2   preliminary injunction (<u>Martin v. Int'l Olympic Comm.</u>, 740 F.2d

3   670, 675 (9th Cir. 1984)), with mandatory injunctive relief

4   considered "particularly disfavored" and warranted only where the

5   facts and law clearly favor the moving party.  <u>Anderson v. U.S.</u>,

6   612 F.2d 1112, 1114 (9th Cir. 1980).

7

8                              **ANALYSIS**

9

10  **A.   Likelihood of Success on the Merits**

11

12       As indicated above, the starting point in analyzing the

13  propriety of preliminary injunctive relief in this matter

14  involves an assessment of whether Plaintiffs can establish a

15  likelihood that they will prevail on the merits.  Examination of

16  the legal bases upon which Plaintiffs' claims are premised show

17  that no such likelihood of success is present.  Each of the

18  primary legal bases for the relief sought by Plaintiff will now

19  be addressed.

20

21       1.  <u>Tenth Amendment Concerns.</u>  Plaintiffs assert, in their

22  First Claim, that by shifting the provision of prescription

23  medications away from the states, the federal government has

24  interfered with state sovereignty over administration of states'

25  own poverty drug programs for its poorest citizens.

26  ///

27  ///

28  ///

1  Plaintiffs contend that such conduct runs afoul of the Tenth

2  Amendment's reservation, to the states, of powers not delegated

3  to the United States by the Constitution.[3]  Plaintiffs

4  specifically contend that the MMA's clawback provision, in

5  requiring state participation in payment for Part D Medicare

6  costs incurred for dual eligibles, is impermissible.  Plaintiffs

7  argue that the federal government has no power to command such an

8  involuntary payment from the states, despite the fact as

9  indicated above that the switch from Medicaid to Medicare appears

10  to have simply entailed a change from states' direct

11  responsibility under Medicaid for fifty percent of expenditures

12  to a new system whereby, in exchange for federal assumption of

13  payment responsibility, the state simply pays the federal

14  government the same fifty percent it would otherwise have had to

15  incur.

16      Defendants oppose Plaintiffs' Tenth Amendment challenge

17  primarily on grounds that private individuals like Plaintiffs

18  herein simply lack standing to raise any question under the Tenth

19  Amendment, pursuant to well-established precedent dating back to

20  Tenn. Elec. Power Co. v. TVA, ("TVA") 306 U.S. 118, 144 (1939).

21  ///

22  ///

23

24      [3]Plaintiffs also make a related argument that the same
conduct violates the Necessary and Proper Clause of Article I,
25  section 8 of the Constitution, on grounds that the Constitution
permits Congress only to make laws as "necessary and proper" to
26  effectuate the powers granted to the federal government by the
Constitution.  Plaintiffs appear to assert that because the care
27  of the poor is reserved to the states under the Tenth Amendment,
federal enactment of laws intruding on such sovereignty is also
28  impermissible under the Necessary and Proper Clause.

11

1  While Plaintiffs do not dispute the import of the TVA holding in

2  this regard, they argue that it has been overruled by a

3  subsequent Supreme Court decision, N.Y. v. U.S., 505 U.S. 144

4  (1992).  In passing, the Court's N.Y. decision noted that "the

5  Constitution divides authority between federal and state

6  governments for the protection of individuals" (Id. at

7  181), and while one Seventh Circuit decision has deemed that

8  pronouncement to have effectively overruled TVA (see Gillespie v.

9  City of Indianapolis, 185 F.3d 693, 700-03 (7th Cir. 1999), other

10  courts have concluded just the opposite, reasoning that because

11  the N.Y. decision does not even mention TVA, it cannot be

12  construed as effectively overruling it.  See Medeiros v. Vincent,

13  431 F.3d 25, 34 (1st Cir. 2005).  In Artichoke Joe's California

14  Grand Casino v. Norton, 278 F. Supp. 2d 1174, 1181 (E.D. Cal.

15  2003), the court found that the Supreme Court has not overruled

16  its TVA holding while noting other cases, including the Seventh's

17  Circuit's Gillespie opinion, that reached the opposite

18  conclusion.

19      In addition, because N.Y. involved only a claim asserted by

20  the State of New York, the question of private party standing

21  under the Tenth Amendment was simply not an issue in that case,

22  and the word standing was never even mentioned in the N.Y.

23  decision.  Id.

24      It is well-recognized that only the Supreme Court itself has

25  the prerogative of overruling its own decisions.  City of

26  Roseville v. Norton, 219 F. Supp. 2d 130, 147-48 (D.D.C. 2002).

27  ///

28  ///

1   The <u>N.Y.</u> decision is not sufficient to overrule a long-

2   established lack of standing on the part of private litigants to

3   enforce sovereignty issues under the Tenth Amendment.  As the

4   government points out, California has ample resources to object

5   to the provisions of the MMA should it choose to do so.

6         Even aside from standing, which the Court believes is fatal

7   to Plaintiffs' Tenth Amendment claims in this case, Congress has

8   in any event authority under the Tax and Spending Clause to urge

9   states to adopt legislative programs consistent with federal

10   interests.  <u>N.Y.</u>, 505 U.S. at 166-67.  See also <u>S.D. v. Dole</u>, 483

11   U.S. 203, 207 (1987) (condition imposed on receipt of federal

12   funding upheld against Tenth Amendment challenge).  Congress thus

13   has the "power to fix the terms upon which its money allotments

14   to states shall be disbursed."  <u>Mayweathers v. Newland</u>, 314 F.3d

15   1062, 1069 (9th Cir. 2002).

16         By providing services to states' citizens under Medicare

17   that formerly were provided by the states, the federal government

18   simply is asking that monies the state formerly paid be

19   transferred to it.  The government hence links its provision of

20   prescription drug coverage to such payment.  While the states

21   could presumably elect to continue to provide such coverage with

22   no contribution whatsoever from the federal government,

23   government funding is linked to its recoupment of a portion of

24   its expenses from the states.  This appears to be permissible

25   under the Tenth Amendment under the above-cited cases.

26   ///

27   ///

28   ///

1        2. Unlawful Delegation of Legislative Powers.  Plaintiffs

2   allege, in their Second Claim, that the MMA's delegation of

3   responsibility, to the Secretary, for approval of drug

4   formularies amounts to an abdication of its own legislative

5   responsibility.  According to Plaintiffs, this violates the so

6   called non-delegation doctrine identified by the Supreme Court in

7   Panama Refining Co. v. Ryan, 293 U.S. 388, 421-22 (1935).

8        This argument is patently untenable.  It has long been

9   settled that to burden Congress with all federal rulemaking would

10  defeat the concept of a workable national government.  Loving v.

11  U.S., 517 U.S. 748, 758 (1996).  Hence Congress passes

12  constitutional muster by legislating in broad terms and leaving a

13  certain degree of discretion to executive or judicial actors.

14  Touby v. U.S., 500 U.S. 160, 165 (1991).  To survive a challenge

15  under the non-delegation doctrine, Congress only has lay down an

16  intelligible principle pursuant to which a person authorized to

17  act must conform.   Whitman v. Am. Trucking Ass'ns, 531 U.S. 457,

18  474-75 (2001).

19       Here, while Congress has given the Secretary discretion to

20  approve Part D private drug formularies, it has directed that

21  each formulary include drugs within each therapeutic category and

22  class of covered Part D drugs, although not necessarily all drugs

23  with such categories or classes.  42 U.S.C. § 1395w-

24  104(b)(3)(C)(i).  Hence the Secretary has been given broad

25  guidelines from which to exercise his discretion in approving

26  such formularies.

27  ///

28  ///

14

1    In addition, in disapproving drug plans, Congress has indicated

2    that there must be some evidence that the plan's practices

3    discourage enrollment, and that this discouragement will likely

4    have a substantial effect on certain Medicare beneficiaries.   42

5    U.S.C. § 1395w-111(e)(2)(D)(I).   All of this provides enough

6    direction to the Director to survive challenge under the non-

7    delegation doctrine.

8

9         3.  Violations of Fifth Amendment Rights.   Plaintiffs

10    contend that their due process rights as protected by the Fifth

11    Amendment are violated by the MMA's requirement that dual

12    eligibles make nominal co-payments for needed prescriptions.

13    Plaintiffs appear to argue that requiring such payments is not

14    only unjustifiable and in derogation of Fifth Amendment due

15    process but also amounts to discrimination against the poor in

16    violation of equal protection concerns also guaranteed by the

17    Fifth Amendment.

18         It has long been held that the due process clauses of both

19    the Fifth and Fourteenth Amendments are intended to prevent

20    governmental abuse of power, and "generally confer no affirmative

21    right to governmental aid". DeShaney v. Winnebago County Dep't

22    of Soc. Servs., 489 U.S. 189, 196 (1989).   Moreover, with respect

23    to equal protection, the constitutionality of the co-payment

24    provision must be judged under a rational basis standard, since

25    poverty alone is not a suspect classification demanding strict

26    scrutiny.  See Harris v. McCrae, 448 U.S. 297, 323 (1980).

27    ///

28    ///

1    Consequently the government need only show a rational

2    relationship between its requirement of co-payments and a

3    legitimate governmental purpose.  Bd. Of Trs. Of Univ. Of Ala. v.

4    Garrett, 531 U.S. 356, 367 (2001).

5         Here, the government can show a rational relationship

6    between allocating limited aid dollars and fostering investment

7    by dual eligibles in the efficiency of their own medical care

8    through demanding small co-payments as a demonstration of

9    accountability.

10        Plaintiffs also appear to argue that their due process

11   rights are infringed by the delegation to privately administered

12   drug formularies of control over their ultimate drug benefits,

13   and by participants' random assignment to such formularies.

14   Plaintiff ILC, for example, contends that some drug plans are

15   more comprehensive than others, and some authorize fewer drugs

16   than would have previously available under MediCal.  Plaintiffs

17   also assert that to the extent dual eligibles are enrolled in a

18   "bottom" plan, their Fifth Amendment rights are violated.

19   Plaintiffs ignore the fact, however, that all drug formularies

20   must include medications across the therapeutic spectrum.  See 42

21   U.S.C. § 1395w-104(b)(3)(C)(i).  In addition, participants who

22   still claim that they need a particular drug not on the formulary

23   can apply for a waiver through the appeal process.  These

24   safeguards adequately protect participants' rights.  Plaintiffs

25   are not entitled to optimal coverage so long as the coverage they

26   are afforded is adequate, as the Court believes to be the case

27   here.

28   ///

As indicated above, due process rights are not impinged simply because of limitations in governmental aid implicit in coverage that falls short of offering unrestricted access to all prescription drugs.

     4.  Automatic Enrollment Provision.  For a Third Claim, Plaintiffs appear to assert that dual eligibles who for whatever reason have not successfully enrolled in Medicare Part D coverage, despite the automatic enrollment provisions of the MMA, should be permitted to retain coverage under MediCal on an indefinite basis if no enrollment occurs.  This argument is disingenuous in light of the stopgap measures provided by both California and the federal government in paying claims temporarily under MediCal (on the state's part) and in allowing dual eligibles the right to at receive refills of their medications on a one-time basis even if not yet effectively enrolled in Medicare (through the federal government).

     5.  Eleventh Amendment Immunity.  Defendant Sandra Shewry, as Director of the California Department of Health Services, is named as a Defendant in this action, as is California State Controller Steve Westly.[4]  Defendant Shewry's focus in opposing this motion is that state immunity under the Eleventh Amendment bars this action in the first instance.

_____

[4]Although Steve Westly has not submitted any direct opposition to Plaintiff's Motion, and while Plaintiffs try to make much of that omission, as the person directly responsible for administering California's MediCal program it would appear that Ms. Shewry is in fact the proper party to advance California's interest in this matter.

1    Defendant Shewry position appears to be correct.

2        The Eleventh Amendments bars federal courts for exercising

3    jurisdiction over a suit brought against a state in federal court

4    by its own citizens.  A state is immune from such an action.

5    Papasan v. Allain, 478 U.S. 265, 276 (1986).  In addition, naming

6    a state official rather than the state itself does not save a

7    lawsuit from the bar imposed by the Eleventh Amendment if the

8    state is deemed the real party in interest.  Idaho v. Coeur

9    d'Alene Tribe, 521 U.S. 261, 277-78 (1997).  Where a lawsuit

10   seeks relief that must be paid by the state treasury, the state

11   is deemed the real party in interest even though individual

12   officials are denominated as nominal defendants.  Ford Motor Co.

13   v. Dep't of Treasury, 323 U.S. 459, 464 (1945).

14       The State of California argues that this lawsuit effectively

15   seeks monetary relief because Plaintiff seek reversion to the

16   previous system under which dual eligibles received prescription

17   drugs under MediCal, a program funded in part by state dollars.

18   They argue that such a result would unquestionably impact the

19   state treasury, and could have an even more pronounced result

20   than the previously administered MediCal system for two reasons.

21   First, with the dismantling of the Medicaid drug reimbursement

22   system, the State argues that rebates previously required from

23   pharmaceutical companies might no longer available.  Secondly, if

24   California were to pay for dual eligible provisions in

25   contravention of Part D Medicare, it might no longer be entitled

26   to the matching federal funds it had previously received under

27   the old system.  Both these factors could well make exclusive

28   state payment for prescriptions considerably more expensive.

18

1      Plaintiffs try to avoid the import of these concerns by
2 arguing that this case falls within the limited exception to
3 Eleventh Amendment preclusion established by Ex Parte Young, 209
4 U.S. 123 (1908).  In that case, suit against a state was
5 permitted where only prospective equitable relief was sought as
6 opposed to any form of money damages or other legal relief.
7 Plaintiffs here argue that the relief requested is prospective
8 and equitable only despite the obvious fiscal impact as well as
9 the fact that individual Plaintiffs would appear to seek the
10 equivalent of money damages in the form of co-pay recoupment.

11      In determining whether the Ex Parte Young exception applies,
12 courts should look to the substance rather than the form of the
13 relief sought.  Papasan, 478 U.S. at 278-79.  As the State points
14 out, the primary purpose driving this lawsuit is State payment
15 for prescription drugs.  That goes beyond mere equitable relief,
16 as does the Plaintiffs' demand that no co-payments be required.

17      If any doubt remained as to the propriety of maintaining
18 this action under Ex Parte Young on the basis of the relief
19 sought, that doubt is put to rest by the additional requirement
20 of the Young doctrine that "the underlying authorization upon
21 which the named official acts is asserted to be illegal."  Id. at
22 277.  Here there can be no doubt that the Director acted legally
23 in coordinating California's MediCal system with the changes
24 authorized by Congress in enacting Medicare's new Part D
25 provision for providing prescription drugs.
26 ///
27 ///
28 ///

1   Plaintiffs cannot dispute this, and consequently Plaintiffs
2   cannot show any likelihood of success as to their claims against
3   the State of California.[5]

4

5   **B.   Irreparable Harm**

6

7       The irreparable harm alleged by Plaintiffs in this case is
8   premised almost entirely on speculation as to what could happen
9   if certain Plaintiffs cannot obtain needed medicines, or what
10  could occur if other individuals qualifying as dual eligibles are
11  not in fact enrolled in Medicare Part D prescription coverage.
12  Irreparable injury for purposes of qualifying for injunctive
13  relief, however, cannot be based on sheer speculation. Goldie's
14  Bookstore, Inc. v. Super. Ct. Of State of Cal., 739 F.2d 466, 472
15  (9th Cir. 1984).
16      To the extent that any Plaintiff (or other dual eligible for
17  that matter) needs medication not included within his or her
18  assigned formulary, an "exception" or appeal from a denial of
19  coverage as to the non-included drug may be filed.
20  ///
21  ///
22  ///

23

24          [5]It should also be noted that even aside from Eleventh
    Amendment concerns, granting the relief sought by Plaintiffs
25  would amount to a mandate that the State of California reinstate
    MediCal coverage to dual eligibles when it has already, in the
26  wake of MMA, enacted legislation withdrawing such coverage.  See
    California Welfare and Institutions Code § 14133.23(a) and
27  (b)(1).  This court cannot issue a mandate to compel fiscal
    appropriations; only the state legislature can authorize such
28  expenditures.  Hopkins v. Saunders, 93 F.3d 522, 527 (8th Cir.
    1996).

                                20

1   This assumes that generic or other drugs that are available on

2   any given formulary do not meet patient needs.[6]   No Plaintiff has

3   shown that they have exercised such appeal options

4   unsuccessfully, and consequently no irreparable injury beyond

5   impermissible speculation has been demonstrated.[7]

6       Plaintiffs' additional contention that minimal co-payments

7   constitute irreparable harm also cannot be sustained given the

8   fact that an attack on the propriety of such payments amounts, in

9   essence, to a challenge to amounts awarded in governmental aid.

10  As indicated above, there is generally no constitutional right to

11  governmental aid.   DeShaney, 489 U.S. at 196.   Moreover, because

12  any equal protection argument in this case requires scrutiny only

13  under a rational basis, and because requiring such co-payments

14  withstands such analysis, there can be no irreparable harm

15  founded on an equal protection analysis, either.

16      Finally, Plaintiffs' challenges to the automatic enrollment

17  provisions are unpersuasive.

18  ///

19  ///

20  ///

21  ///

22

23      [6]In some 90 percent of cases a doctor can successfully
    prescribe a different drug that is on a plan formulary.  (See
24  Decl. of Paul Lofholm, ¶ 8).

25      [7]While the Court recognizes that Defendants also claim that
    Plaintiffs' failure to exhaust their administrative remedies in
26  this regard is yet another bar to this lawsuit, the Court does
    not believe that argument is dispositive in ruling on the present
27  motion for injunctive relief and consequently will not address it
    here except insofar as it bears on the irreparable harm issue as
28  discussed in this section.

21

While Plaintiffs have produced evidence to show that automatic enrollment had not been completed within the first two weeks after implementation of the new Medicare Part D program, they have presented no competent evidence of ongoing failure during the remaining transition process that would constitute irreparable harm, particularly given the assistance provided by both the state and federal governments to aid that process as discussed above.

**C.   Balance of Hardships**

Any new legislation with the sweep of the MMA inevitably requires adjustment.  As discussed above, provisions have been made to ease that adjustment process, and Plaintiffs have failed to produce convincing evidence that measures undertaken have been ineffective.  Plaintiffs would advocate throwing the entire Medicare Part D program into jeopardy because of alleged inconvenience to a small portion of the 42 million Americans entitled to the new prescription drug coverage.[8]  Practical difficulties in trying to return to the old Medicaid system not now that the Medicare drug program is in operation would be immense.  (See Culotta Decl., ¶ 18-19).  The balance of hardship tips overwhelmingly in favor of continuation of the Medicare drug-benefit program without interruption.

///

---

[8]Only about 6 million of the 42 million individuals who qualify for coverage under Medicare Part D are dual eligibles. (See Federal Defs.' Opp'n, pp. 1-2).

**CONCLUSION**

The dispositive issue in denying injunctive relief rests in this case with the fact that Plaintiffs have not shown any likelihood of success on the merits.  Plaintiffs lack standing to pursue any constitutional challenge to the MMA premised on the Tenth Amendment.  In addition, Plaintiffs are wrong in claiming that discretion given under the MMA to the Secretary in approving drug plans violates the non-delegation doctrine.  Plaintiffs similarly have not established viable Fifth Amendment due process/equal protection claims stemming either from co-payment provisions or from operation of drug plans/formularies under Part D of Medicare.

Moreover, with respect to the injunctive relief sought, Plaintiff's demand that the State of California continue providing prescription drug coverage under MediCal is barred by the Eleventh Amendment.  Furthermore, and in any event, this Court lacks power to compel a state to make what amounts to fiscal appropriations necessary to fund a reversion to the old MediCal system.  Only the California legislature may make such appropriations.  <u>Hopkins v. Saunders</u>, 93 F.3d at 527.

For all these reasons, the likelihood of Plaintiffs' prevailing on the merits here is slim.  In addition, the irreparable injury identified by Plaintiffs is largely speculative, and the balance of hardships tip squarely against granting preliminary injunctive relief.

///

///

Because Plaintiffs in essence seeks a reversion to the pre-MMA state of affairs, the mandatory injunction they seek is particularly disfavored and must be denied unless both the facts and law clearly favor the moving party.  Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1996).  Here that high threshold has not been met.

Much of the potential harm identified by Plaintiff consists of transition difficulties that both the state and federal governments have attempted to remedy through emergency and/or short term legislation.  Mechanisms are in place that allow flexibility in drug formularies which are already designed to encompass the therapeutic spectrum.  On the other hand, disrupting the transition to Medicare at this point could entail enormous logistical challenges and throw the entire system into disarray once again, as opposed to allowing transition issues to simply resolve with the passage of additional time post-enactment of Part D.

For all the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction is DENIED.


IT IS SO ORDERED.


DATED: May 19, 2006

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE

24